## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| KALORAMA CITIZENS ASSOCIATION,<br><br>and<br><br>ADAMS MORGAN FOR REASONABLE DEVELOPMENT,<br><br>Plaintiffs,<br><br>v.<br><br>SUNTRUST BANK COMPANY,<br><br>Defendant. | Civil Action No. 18-528 (BAH)<br><br>Chief Judge Beryl A. Howell |

### <u>MEMORANDUM OPINION</u>

Plaintiffs Kalorama Citizens Association ("KCA"), an incorporated nonprofit membership association, and Adams Morgan for Reasonable Development ("AMRD"), an unincorporated nonprofit association, move for summary judgment to enforce an alleged common law easement by public dedication that they claim gives the public the right to use, in perpetuity, a 4,000 square foot plaza located at 1800 Columbia Road N.W., in the Adams Morgan neighborhood of Washington, D.C. Pls.' Mot. Summ. J. ("Pls.' Mot.") at 2, ECF No. 24. Defendant Trust Bank, successor by merger to named defendant SunTrust Bank Company ("SunTrust"), has cross-moved for summary judgment, contending that plaintiffs lack standing to assert enforcement of the alleged easement and, in any event, fail to establish an easement by public dedication. Def.'s Renewed Mot. Summ. J. ("Def.'s Mot.") at 2–3, ECF No. 25. This dispute was extensively litigated for almost one year in the Superior Court of the District of Columbia and removed, in March 2018, to this Court, with the pending cross-motions for summary judgment unresolved and subsequently re-filed here. For the reasons explained below,

1

this Court lacks subject matter jurisdiction over plaintiffs' claim and therefore this case must be remanded to the Superior Court of the District of Columbia.

## I.    BACKGROUND

### A.    Factual Background

The two plaintiff nonprofit membership associations, KCA and AMRD, share similar missions.  KCA's mission is to "promote particularly the interests of the residents of the District of Columbia," particularly of the Adams Morgan neighborhood, and to "preserve the historic, architectural and aesthetic character" of that area.  Pls.' Mot., Ex. 16, Kalorama Citizens Association Constitution at 1 art. II, ECF No. 24-2; *id.*, Ex. 17, Dep. of Denis James at 13:12–17, ECF No. 24-2.  AMRD "seeks to protect and preserve the personal and property interests of DC residents, families, and those living, working, and playing in the historic and unique Adams Morgan neighborhood."  Pls.' Opp'n to Def. SunTrust's Mot. Summ. J. ("Pls.' Opp'n"), Ex. 33, Governing Principles of AMRD at 1, ECF No. 27-2.

Defendant Truist Bank, a Georgia corporation, is the successor by merger to defendant SunTrust Bank Company ("SunTrust").[1]  It owns a bank branch property at 1800 Columbia Road, N.W. in the Adams Morgan neighborhood of Washington, D.C. (the "branch property"), which is part of the Washington Heights Historic District, Pls.' Mot., Ex. 19, Map of the Washington Heights Historic District, ECF No. 24-2.  A 4,000 square foot plaza at that location (the "Plaza") has for many years functioned as a community space for the neighborhood.  Pls.' Mem. Supp. Mot. Summ. J. ("Pls.' Mem.") at 2, ECF No. 24; Defs.' Am. Answer ("Am.

---

[1]     Plaintiffs' Complaint identifies as the first-named defendant SunTrust Bank Company d/b/a SunTrust Bank a/k/a SunTrust Banks, Inc.  *See* Complaint ("Compl."), *Kalorama Citizens Ass'n v. SunTrust Bank Co.*, No. 2017-CA-4182 (D.C. Sup. Ct. June 15, 2017).  Truist Bank "is the successor by merger to SunTrust Bank" and "was formed on December 7, 2019, by the merger of SunTrust Bank into Branch Banking and Trust Company and Branch Banking and Trust Company's subsequent change of its name to Truist Bank."  Def.'s Mem. Supp. Renewed Mot. Summ. J. ("Def.'s Mem.") at 1 n.1, ECF No. 25-1.

Answer") ¶ 27, *Kalorama Citizens Ass'n v. SunTrust Bank Co.*, No. 2017-CA-4182 (D.C. Sup. Ct. July 31, 2017).   The Plaza hosts a weekly farmers' market and other community activities, including cider making, dancing, live music, road races, historical events, and annual events such as Three Kings Day and Adams Morgan Day.  *See* Pls.' Mot., Ex. 7, Dep. of Frank Smith at 62:2–10, ECF No. 24-2; *id.*, Ex. 23, Defs.' Statement of Undisputed Materials Facts Filed in D.C. Superior Court (June 23, 2017) ¶ 42, ECF No. 24-2; *id.*, Ex. 24, Photographic Exhibits of the Plaza, ECF No. 24-2.  Members of the community regularly participate in activities held on the Plaza, and benefit from the social, recreational, and cultural opportunities offered in the space.  *See generally* Pls.' Opp'n, Ex. 34, Aff. of Mary Belcher ("Belcher Aff."), ECF No. 27-2; *id.*, Ex. 35, Aff. of John L. Hargrove ("Hargrove Aff."), ECF No. 27-2; *id.*, Ex. 36, Aff. of Val Morgan ("Morgan Aff."), ECF No. 27-2; *id.*, Ex. 37, Aff. of Terry Tyborowski ("Tyborowski Aff."), ECF No. 27-2; *id.*, Ex. 38, Aff. of Katherine Rigby ("Rigby Aff."), ECF No. 27-2.

The Plaza resulted from the initial efforts of Perpetual Federal Savings and Loan Association ("Perpetual") to build a bank branch in the Adams Morgan neighborhood.  In 1976, Perpetual acquired the then-undeveloped parcel of real estate at 1800 Columbia Road, N.W. Def.'s Mot., Ex. 7, Devolution of Title at 2, ECF No. 25-10.  The vacant branch property was used for a variety of community activities, including a weekly farmers' market.  Compl. ¶ 17; Pls.' Mot., Ex. 2, Aff. of Marie Nahikian ("Nahikian Aff.") ¶ 7, ECF No. 24-2; Def.'s Mem. at 4, ECF No. 25-1.  Perpetual applied to the Federal Home Loan Bank Branch Board ("FHLBB") for approval to build a bank branch on the branch property.  *See* Def.'s Mem. Opp'n Pls.' Mot. Summ. J. ("Def.'s Opp'n"), Ex. 1, Archived FHLBB Materials ("FHLBB Materials") at 6, ECF No. 28-3.  Several community groups formally protested Perpetual's application before the FHLBB, citing their concerns about Perpetual's mortgage lending practices, including

allegations of redlining and failure to lend to low- and middle-income Adams Morgan residents. *Id.* at 6, 12; Def.'s Mot., Ex. 14, Dep. of Frank Smith ("Smith Dep.") at 10:22–25, 11:1–3, 19:12–15, ECF No. 25-17; Nahikian Aff. ¶¶ 9–10.  Outside of the FHLBB challenge, the groups also raised "the very, very specific concern about if the building was built, what it would look like and what would happen to the Plaza at 18th and Columbia Road in that space there."  Pls.' Mot., Ex. 6, Dep. of Marie Nahikian at 32:10–16, ECF No. 24-2.  Perpetual gained community buy-in for its proposed branch through formal commitments to promote lending and home ownership for residents of the Adams Morgan neighborhood, memorialized in a Loan Policy Agreement.  FHLBB Materials at 26–30, 31–32.  In exchange, the community groups agreed to "withdraw their opposition" to Perpetual's application.  *Id.* at 32.  They did so by letter, dated July 21, 1997, and encouraged the FHLBB to accept Perpetual's application "[g]iven Perpetual's acceptance of the Loan Policy Agreement."  *Id.* at 22.  With the protests withdrawn, on August 18, 1977, the FHLBB approved Perpetual's application.  Pls.' Mot., Ex. 14, FHLBB's Order Approving Perpetual's Branch Application (Aug. 18, 1977), at 1, ECF No. 24-2.  The Loan Policy Agreement itself makes no mention of the Plaza, the farmers' market, or any easement.  *See* FHLBB Materials at 24–36.

Separately, Perpetual pledged "to develop the property in such a way as to preserve its open quality, attractiveness and accessibility to the vendors that presently use it" by constructing "a modest three-story building placed as far back as possible in order to allow ample room for vendors and other open-air activities."  Def.'s Mot., Ex. 18, Letter from Thomas J. Owen (Nov. 2, 1976) at 1, ECF No. 25-21.  No written document memorialized an agreement between Perpetual and the community groups with respect to the Plaza.  Smith Dep. at 18:1–15, 66:12–25.  Rather, the parties had an informal "understanding" that Perpetual would provide a space for

the community activities conducted at 1800 Columbia Road N.W. to continue, *id.* at 18:9, which understanding "was material to [the community groups'] agreement to accept" Perpetual's bank branch application, *id.* at 32:16–17.

In 1979, Perpetual completed construction on the branch property at 1800 Columbia Road, N.W., which included the current 4,000 square foot Plaza, and opened the property for use.  Compl. ¶ 1; Def.'s Mem. at 3; Am. Answer ¶ 27.  Perpetual became insolvent in the late 1980s, and, in 1992, its receiver sold many of its assets to Crestar Bank ("Crestar"), Def.'s Opp'n, Ex. 9, Decl. of Andrew J. Tapscott ¶ 6, ECF No. 28-11, including the branch property, which was transferred to Crestar via quitclaim deed, Def.'s Mot., Ex. 3, Decl. of Daniel Simons ("Simons Decl.") ¶ 5, ECF No. 25-6.  SunTrust acquired Crestar by merger in 1998, and therefore became owner of the property.  *Id.* ¶ 4.  As of December 7, 2019, defendant Truist Bank is the successor by merger to SunTrust.  Def.'s Mem. at 1 & n.1.  Perpetual and each of its successors voluntarily granted permission for the community to use the Plaza for the weekly farmers' market and other events upon request.  Simons Decl. ¶¶ 7–8; Def.'s Opp'n, Ex. 5, Dep. of Gilbert Earl DeLorme at 23–24, 32–33, 40–43, ECF No. 28-7; Notice of Removal, Ex. G, Part 2, Superior Court Documents at 6–55, 62–63 (Memorandum from Linda Ragan to Steward T. Henderson (May 28, 1996)) (describing "an agreement that was written for Perpetual American Federal Savings and Loan Association," *id.* at 62, governing the farmers' market), 123–25 (Temporary Farmers' Market Space Agreement), 128–64 (copies of temporary use agreements between owners of the branch property and users of the Plaza), ECF No. 1-8.

In 2015, SunTrust entered into a purchase and sale agreement to sell the branch property to 1800 Columbia Road, LLC, an entity owned by four property development companies (the "developers").  Def.'s Opp'n, Ex. 10, Decl. of Shawn Seaman ("Seaman Decl.") ¶ 3, ECF No.

28-12.  This executory contract is subject to a preliminary injunction issued in D.C. Superior Court, and therefore has not been finalized.  *See* Notice of Removal, Ex. B, Order at 1, ECF No. 1-2.  The developers plan to replace the current branch building and Plaza "with a mixed-use development comprised of retail shops and residential condominiums."  Seaman Decl. ¶ 4.  Their concept for the property would demolish the Plaza and would provide instead a much smaller gathering space of approximately 380 square feet.  *See* Pls.' Mot., Ex. 28, Conceptual Design for Development Project for 1800 Columbia Road as Submitted by PN Hoffman & Potomac Investment Properties to the Historic Preservation Review Board for its Meeting on Jan. 25, 2017, ECF No. 24-2; *id.*, Ex. 30, Decl. of Hugo A. Roell ¶ 3, ECF No. 24-2.

Plaintiffs undertook extensive efforts to halt the sale and redevelopment of the branch property and the demolition of the Plaza, including resolutions, petitions, and community organizing; correspondence with the developers and elected officials; and testimony before the Historic Preservation Review Board.  *See* Def.'s Opp'n, Ex. 6, Dep. of Vikram Surya Chiruvolu at 33:8–24, 39:9–12, 47:9–25, 69–71, ECF No. 28-8; *id.*, Ex. 9, Dep. of Christopher Otten at 49, ECF No. 28-11; *id.*, Ex. 11, Resolution of KCA, ECF No. 28-13; *id.*, Ex. 12, saveourplaza.com Petition, ECF No. 28-14; *id.*, Ex. 14, Presentation by Vikram Surya Chiruvolu, AMRD, to the Historic Preservation Review Board, ECF No. 28-16; *id.*, Ex. 19, Plaintiffs' Production at 2 (KCA Meeting Minutes (Oct. 20, 2016)), 142–43 (email describing AMRD public forum (July 12, 2016)), ECF No. 28-21; *id.*, Ex. 36, iPetitions.com Petition, ECF No. 28-38.  Nonetheless, the District of Columbia Historic Preservation Review Board approved the proposed development of the branch property as "compatible" with the Washington Heights Historic District on January 26, 2017.  *Id.*, Ex. 20, Minutes of Jan. 26, 2017 Meeting of the District of Columbia Historic Preservation Review Board ("Historic Preservation Review Board Minutes")

at 2, ECF No. 25-22.  On May 3, 2017, the developers applied for a raze permit to demolish the

Plaza and branch building.  Pls.' Mot., Ex. 26, Raze Permit Application, ECF No. 24-2.

### B.    Procedural History

On June 15, 2017, plaintiffs filed suit in the Superior Court of the District of Columbia

against SunTrust (now succeeded by defendant Truist Bank), Crestar,[2] and the developers.  *See*

Compl.  Plaintiffs' complaint alleged that, although SunTrust was a Georgia corporation, *id.* ¶ 8,

the developers were citizens of the District of Columbia, *id* ¶¶ 11–14, defeating the complete

diversity necessary to invoke the diversity jurisdiction of the federal courts, *see* 28 U.S.C.

§ 1332.  The complaint set forth a single claim for "declaratory and injunctive relief" to enforce

"an easement by dedication in favor of the public for the Plaza."  Compl. ¶ 1; *see also id.* ¶¶ 37–

46.  Defendants' answer raised a number of affirmative defenses, including that "[p]laintiffs lack

standing to assert their claim."  Answer ¶ 53, *Kalorama Citizens Ass'n*, No. 2017-CA-4182

(D.C. Sup. Ct. June 23, 2017); *see also* Am. Answer ¶ 53.  Simultaneously with their answer,

defendants filed a motion for summary judgment, which was not predicated on plaintiffs' lack of

standing and did not discuss standing.  *See* Defs.' Mot. Summ. J, *Kalorama Citizens Ass'n*, No.

2017-CA-4182 (D.C. Sup. Ct. June 23, 2017); Defs.' Mem. Supp. Mot. Summ. J., *Kalorama

Citizens Ass'n*, No. 2017-CA-4182 (D.C. Sup. Ct. June 23, 2017).

On June 16, 2017, plaintiffs moved for a preliminary injunction to halt demolition of the

Plaza during the pendency of the litigation.  Pls.' Mot. Prelim. Inj. at 1, *Kalorama Citizens Ass'n*,

No. 2017-CA-4182 (D.C. Sup. Ct. June 16, 2017).  On August 4, 2017, the motion was granted,

preliminarily enjoining defendants "from demolishing the Plaza . . . or otherwise interfering with

the public's use and enjoyment of said Plaza."  Order at 1, *Kalorama Citizens Ass'n*, No. 2017-

CA-4182 (D.C. Sup. Ct. Aug. 4, 2017).  Looking to *Brown v. Consolidated Rail Corp.*, 717 A.2d

---

[2]      Crestar is not a party to this litigation.  *See* Docket.

309 (D.C. 1998), as its sole D.C. authority, Maryland case law, and out-of-state authorities, the Superior Court found that plaintiffs "made a fairly strong evidentiary showing . . . as to the merits of their claim for a common law easement by dedication," sufficient to warrant a preliminary injunction.  Pls.' Mot., Ex. 1, Judge Edelman's Opinion (Aug. 4, 2017) ("Edelman Op.") at 17:19–22, ECF No. 24-2.  The court also observed, however, that "there are numerous issues and problems that have been raised, both factually and legally[,] with respect to the plaintiffs' claim."  *Id.* at 17:23–25.  Consistent with the observation of "numerous issues," on August 7, 2017, defendants' motion for summary judgment was denied because "considerable disputes of fact exist[ed] as to the validity of the claimed easements."  Order at 2, *Kalorama Citizens Ass'n*, No. 2017-CA-4182 (D.C. Sup. Ct. Aug. 7, 2017).

On September 27, 2017, defendants moved to dissolve the preliminary injunction and dismiss the case.  Defs.' Joint Mot. Dissolve Inj. & Dismiss Case, *Kalorama Citizens Ass'n*, No. 2017-CA-4182 (D.C. Sup. Ct. Sept. 27, 2017).  In support, defendants challenged plaintiffs' standing—both constitutional and prudential—"to bring this case."  Defs.' Mem. Supp. Joint Mot. Dissolve Inj. & Dismiss Case at 10, *Kalorama Citizens Ass'n*, No. 2017-CA-4182 (D.C. Sup. Ct. Sept. 27, 2017); *see also id.* at 10–16; Defs.' Reply Mem. Supp. Joint Mot. Dissolve Inj. & Dismiss Case at 2–4, *Kalorama Citizens Ass'n*, No. 2017-CA-4182 (D.C. Sup. Ct. Oct. 18, 2017).  This motion was denied, since defendants "d[id] not invoke any 'significant' or 'unforeseen' change in circumstances" warranting dissolution of the preliminary injunction, but instead "ma[de] legal arguments regarding standing" and other subjects appropriate to a motion to dismiss.  Order at 3, *Kalorama Citizens Ass'n*, No. 2017-CA-4182 (D.C. Sup. Ct. Jan. 9, 2018).  The court denied defendants' motion to dismiss without prejudice, without addressing specifically the merits of the motion to dismiss or plaintiffs' standing.  *Id.* at 4.

8

SunTrust again raised the issue of standing in a motion for summary judgment filed in Superior Court on February 2, 2018.  SunTrust's Mot. Summ. J. at 1–2, *Kalorama Citizens Ass'n*, No. 2017-CA-4182 (D.C. Sup. Ct. Feb. 2, 2018).  Plaintiffs cross-moved for summary judgment on the same day.  *See* Pls.' Mot. Summ. J., *Kalorama Citizens Ass'n*, No. 2017-CA-4182 (D.C. Sup. Ct. Feb. 2, 2018).  These motions were never resolved by the Superior Court. The four developers also moved for summary judgment on that day, *see* Developer Defs.' Mot. Summ. J., *Kalorama Citizens Ass'n*, No. 2017-CA-4182 (D.C. Sup. Ct. Feb. 2, 2018), and this motion was granted on March 5, 2018, because the developers "d[id] not have a proprietary interest in the property at issue," as the "executory contract with Suntrust Bank for the development of the property . . . is subject to a preliminary injunction . . . until this case is resolved," Notice of Removal, Ex. B, Order at 1, ECF No. 1-2; *see also* Notice of Removal, Ex. C, Judgment at 1, ECF No. 1-3.

On March 7, 2018, only a week before a scheduled pretrial conference and after discovery was substantially completed, *see* Order, *Kalorama Citizens Ass'n*, No. 2017-CA-4182 (D.C. Sup. Ct. Mar. 7, 2018) (scheduling a pretrial conference for March 13, 2018 at 9:30 AM), SunTrust, the single remaining defendant in the case, filed a Notice of Removal in this Court, conceding that "[c]omplete diversity . . . did not exist at the time of filing of the Complaint" because the complaint alleged that the developers were District of Columbia citizens, Notice of Removal ¶¶ 3, 4, ECF No. 1, but, upon dismissal of those parties from the case, in combination with the branch property's value in excess of $5,000,000, *see id.* ¶ 23, diversity jurisdiction under 28 U.S.C. § 1332 existed and "this action became immediately removable pursuant to 28 U.S.C. § 1441," *id.* ¶ 6.  On April 2, 2018, plaintiffs filed a motion to remand to D.C. Superior Court, Pls.' Mot. Remand, ECF No. 7, which was denied, Min. Order (Nov. 28, 2018).

Thereafter, the parties were directed to re-file their cross-motions for summary judgment that had been pending in Superior Court.  *See* Scheduling Order, ECF No. 21.  On April 6, 2020, plaintiffs and defendant timely re-filed their cross-motions for summary judgment, which had originally been filed on February 2, 2018 in Superior Court, *see* Pls.' Mot; Def.'s Mot., and became ripe on April 27, 2020, *see* Def.'s Reply Supp. Renewed Mot. Summ. J. ("Def.'s Reply"), ECF No. 31; Min. Entry (Mar. 3, 2020).  A month later, on May 26, 2020, this case was reassigned to the undersigned Judge.  Notice of Reassignment, ECF No. 33.

## II.    LEGAL STANDARD

Under Federal Rule of Civil Procedure 56, "[a] party is entitled to summary judgment only if there is no genuine issue of material fact and judgment in the movant's favor is proper as a matter of law."  *Soundboard Ass'n v. FTC*, 888 F.3d 1261, 1267 (D.C. Cir. 2018) (quoting *Ctr. for Auto Safety v. Nat'l Highway Traffic Safety Admin.*, 452 F.3d 798, 805 (D.C. Cir. 2006)); *see also* Fed. R. Civ. P. 56(a).  In determining whether a genuine dispute as to any material fact exists, the court must "view[] the evidence in the light most favorable to the non-movant."  *Baylor v. Mitchell Rubenstein & Assocs., P.C.*, 857 F.3d 939, 952 (D.C. Cir. 2017) (quoting *Wheeler v. Georgetown Univ. Hosp.*, 812 F.3d 1109, 1113 (D.C. Cir. 2016)).  Where, as here, cross-motions for summary judgment are considered, both parties must be accorded "the solicitude owed non-movants," assessing the evidence in the light most favorable to each.  *Id.*  In conducting this analysis, the record must be "taken as a whole."  *Lopez v. Council on Am.-Islamic Rels. Action Network, Inc.*, 826 F.3d 492, 496 (D.C. Cir. 2016).  "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quotation marks omitted) (citing *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S.

253, 289 (1968)); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986) ("[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial.").

## III.   DISCUSSION

Defendant's pending motion raises for the third time over the course of this litigation before two separate courts the legal issue of whether plaintiffs have standing to pursue their claim. *See* Def.'s Mem. at 15–23; Def.'s Opp'n at 17–21, ECF No. 28; Def.'s Reply at 2–3.  In defendant's view, "because neither [p]laintiffs nor their alleged members seek redress . . . pursuant to the D.C. Administrative Procedure Act," they cannot invoke organizational or associational standing to bring their claim, Def.'s Mem. at 17, and, further, because plaintiffs do not "ha[ve] any ownership interest" in the Plaza and are not acting on behalf of "the holder of the 'public easement'" (that is, the District of Columbia), they lack standing, *id.* at 16; *see also id.* at 19–22.[3]  The first of these arguments implicates plaintiffs' constitutional standing, while the second goes to their prudential standing.

### A.   Overview of Standing Principles

The D.C. Superior Court did not reach the issue of plaintiffs' standing in evaluating defendant's previous motions.  Federal courts, however, are obligated to establish their jurisdiction, of which standing is "[o]ne 'essential and unchanging' component," before turning to the merits of plaintiffs' claims.  *Hancock v. Urban Outfitters, Inc.*, 830 F.3d 511, 513 (D.C. Cir. 2016) (quoting *DaimerChrysler Corp. v. Cuno*, 547 U.S. 332, 342 (2006)).  Thus, "[u]ntil

---

[3]     Defendant argued in its Motion for Summary Judgment and Opposition that plaintiffs "do not even point to any injury, let alone a particularized one" that would confer standing.  Def.'s Opp'n at 18; Def.'s Mem. at 23 ("[Plaintiffs] assert generalized grievances shared by other members of the public.").  As discussed *infra* note 5, plaintiffs rectified this shortcoming in the record by submitting affidavits from individual members describing concrete and particularized injuries with their Opposition.  Perhaps as a result, defendant appears to have abandoned this argument in reply.  *See* Defs.' Reply at 2–3.

that jurisdictional threshold is crossed, 'the court cannot proceed at all in any cause.'" *Id.* (quoting *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94 (1998)).

The burden of establishing the elements of standing lies with plaintiffs. *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994). "[E]ach element" of standing "must be supported . . . with the manner and degree of evidence required at the successive stages of litigation." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992). Accordingly, at summary judgment, plaintiffs "must 'set forth' by affidavit or other evidence 'specific facts,' which for purposes of the summary judgment motion will be taken to be true," establishing injury in fact, causation, and redressability. *Id.* (quoting Fed. R. Civ. P. 56(e)); *see also Scenic Am., Inc. v. U.S. Dep't of Transp.*, 836 F.3d 42, 48–49 (D.C. Cir. 2016).

Though the parties' briefing primarily debates plaintiffs' standing under D.C. law, "standing in federal court is a question of federal law, not state law." *Hollingsworth v. Perry*, 570 U.S. 693, 715 (2013). Plaintiffs thus must demonstrate both constitutional and prudential standing. To establish constitutional standing, plaintiffs must fulfill the familiar requirements that they have (1) "suffered an injury in fact," *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016) (citing *Lujan*, 504 U.S. at 560–61), that is "concrete and particularized" and "actual or imminent," *id.* at 1548 (quoting *Lujan*, 504 U.S. at 560); (2) "that is fairly traceable to the challenged conduct of the defendant"; and (3) "that is likely to be redressed by a favorable judicial decision," *id.* at 1547 (citing *Lujan*, 504 U.S. at 560–61). "Prudential standing, like Article III standing, is a threshold, jurisdictional concept." *Deutsche Bank Nat'l Tr. Co. v. FDIC*, 717 F.3d 189, 194 n.4 (D.C. Cir. 2013) (citing *Steffan v. Perry*, 41 F.3d 677, 697 (D.C. Cir. 1994) (en banc)).[4] The doctrine encompasses a number of limitations, including "the

---

[4]   The Supreme Court has observed that "[t]he limitations on third-party standing" may go to the merits of a plaintiff's claim, rather than the court's jurisdiction. *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572

general prohibition on a litigant's raising another person's legal rights." *Am. Immigr. Lawyers Ass'n v. Reno*, 199 F.3d 1352, 1357 (D.C. Cir. 2000) (quoting *Allen v. Wright*, 468 U.S. 737, 751 (1984)).

Given prudential standing's jurisdictional nature, federal courts may "consider . . . prudential standing even before Article III standing" and may find that a party lacks prudential standing "as an alternative holding" to deciding whether the party has Article III standing. *Deutsche Bank Nat'l Tr. Co.*, 717 F.3d at 194 n.4 (first citing *Kowalski v. Tesmer*, 543 U.S. 125, 129 (2004); and then citing *Haitian Refugee Ctr. v. Gracey*, 809 F.2d 794, 807 (D.C. Cir. 1987)); *see also Johnson v. Comm'n on Presidential Debates*, 869 F.3d 976, 982 (D.C. Cir. 2017) ("If both constitutional and prudential objections are raised to standing . . . it is entirely appropriate to deny standing on prudential grounds if that course is easier, or more clearly right, than to rule on constitutional grounds first.") (quoting 13B Charles A. Wright, Arthur R. Miller & Edward H. Cooper, Fed. Prac. & Proc. § 3531.15 (3d ed. 2014)); *Wash. Tennis & Educ. Found., Inc. v. Clark Nexsen, Inc.*, 270 F. Supp. 3d 158, 163 (D.D.C. 2017).  Plaintiffs attempt to enforce a property right held by the District of Columbia on behalf of the public.  This alternative method is therefore appropriate.[5]

---

U.S. 118, 127 n.3 (2014).  The Court, however, left "consideration of that doctrine's proper place in the standing firmament" to "another day."  *Id.*  This Court, therefore, remains bound by the D.C. Circuit's rule that third-party standing is a threshold, jurisdictional issue.  *See, e.g.*, *In re Hope 6 Monroe St. Ltd. P'ship*, 743 F.3d 867, 871 (D.C. Cir. 2014); *Steffan*, 41 F.3d at 697.

[5]     Though resolving the question is not necessary here, plaintiffs would likely have constitutional standing by demonstrating associational standing, which requires that "(1) at least one of [the association's] members would have standing to sue in his own right, (2) the interests the association seeks to protect are germane to its purpose, and (3) neither the claim asserted nor the relief requested requires that an individual member of the association participate in the lawsuit."  *Sierra Club v. EPA*, 292 F.3d 895, 898 (D.C. Cir. 2002) (citing *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 342–43 (1977)).  Plaintiffs submitted affidavits from individual KCA and AMRD members stating that the members frequent the weekly farmers' market and other events held on the Plaza and use the space as "a central neighborhood landmark," Belcher Aff., "a public square," Morgan Aff., and "a physical and communal center," Rigby Aff.; *see generally* Belcher Aff.; Hargrove Aff.; Morgan Aff.; Tyborowski Aff.; Rigby Aff.  The proposed demolition of the Plaza will "irreparably diminish the neighborhood," Hargrove Aff.; Morgan Aff., and "the community," Rigby Aff., they enjoy and value.  Plaintiffs' members thus "use the affected area and are persons 'for whom the aesthetic and recreational values of the area will be lessened'" by the

###### B.    Plaintiffs Lack Prudential Standing

Prudential standing requires that, "[i]n addition to constitutional standing, a plaintiff must have a valid cause of action for the court to proceed to the merits of its claim." *Gunpowder Riverkeeper v. Fed. Energy Regul. Comm'n*, 807 F.3d 267, 273 (D.C. Cir. 2015) (citing *Natural Res. Def. Council v. EPA*, 755 F.3d 1010, 1018 (D.C. Cir. 2014)).  Even a plaintiff who has met the Article III standing requirements "cannot rest [their] claim to relief on the legal rights or interests of third parties." *Warth v. Seldin*, 422 U.S. 490, 499 (1975).  This "prudential limitation" seeks "to avoid 'the adjudication of rights which those not before the Court may not wish to assert' and to ensure 'that the most effective advocate of the rights at issue is present to champion them.'" *LaRoque v. Holder*, 650 F.3d 777, 781–82 (D.C. Cir. 2011) (quoting *Duke Power Co. v. Carolina Env'tl Study Grp., Inc.*, 438 U.S. 59, 80 (1978)).  Consequently, the third-party standing analysis "focuses on who is asserting the claim and why the holder of the asserted right is not before the court." *Am. Immigr. Lawyers Ass'n*, 199 F.3d at 1357.

Plaintiffs seek declaratory and injunctive relief to enforce an alleged easement by public dedication under D.C. common law.[6]  D.C. common law on such easements may not be extensive, but the available cases establish that such an easement "may be presumed from the long continued public user [sic] for the time required in case of prescription, where there is no

---

destruction of the Plaza, *Friends of the Earth, Inc. v. Laidlaw Env'tl Servs. (TOC), Inc.*, 528 U.S. 167, 183 (2000) (quoting *Sierra Club v. Morton*, 405 U.S. 727, 735 (1972)), which, for environmental plaintiffs, constitutes "concrete and particularized injury," *Sierra Club v. Jewell*, 764 F.3d 1, 5 (D.C. Cir. 2014).  Their injuries are also actual and imminent, as the developers' raze permit application was halted only by the Superior Court's preliminary injunction, fairly traceable to defendant's proposed sale of the Plaza to a purchaser who plans to redevelop it, and remediable by an injunction against that sale and development.  The second and third prongs of associational standing are likewise satisfied.  The members' interests with respect to the Plaza are relevant to plaintiffs' goal of preserving Adams Morgan, and "[n]o reason appears why the members' participation in the lawsuit would be necessary." *Kingman Park Civic Ass'n v. Bowser*, 815 F.3d 36, 40 (D.C. Cir. 2016); *see also id.* at 39–40.

[6]    Since "the District of Columbia derives its common law from Maryland as of 1801," *West v. United States*, 866 A.2d 74, 79 n.1 (D.C. 2005), under D.C. law, "decisions of Maryland courts on questions of common law are authoritative in the absence of District authority," *In re C.A.P.*, 633 A.2d 787, 790 (D.C. 1993) (citation omitted); *see also Solid Rock Church, Disciples of Christ v. Friendship Pub. Charter Sch.*, 925 A.2d 554, 561 (D.C. 2007); D.C. Code § 45-401.

evidence to the contrary and where the circumstances attending such use are not inconsistent therewith" or "may arise from unequivocal acts and declarations [of an intent and offer to dedicate] . . . if followed by an acceptance on the part of the public authorities." *District of Columbia v. Robinson*, 14 App. D.C. 512, 545–46 (1899), *aff'd*, 180 U.S. 92 (1901); *see also Lansburgh v. District of Columbia*, 8 App. D.C. 10, 18–19 (1896); *Oettinger v. District of Columbia*, 18 App. D.C. 375, 380 (1901); *cf. Case v. Morrisette*, 475 F.2d 1300, 1312 n.72 (D.C. Cir. 1973) ("[T]here is no basis for resort to the law of dedication because the record nowhere indicates that the District of Columbia has ever accepted [the property].").[7]

These cases leave undecided whether "it is necessary that there shall have been a formal acceptance by the public authorities" in the case of an express offer of dedication. *Lansburgh*, 8 App. D.C. at 18. At a minimum, however, informal or implied acceptance by a public entity is required. *See id.* at 19 (finding implied acceptance of an express offer to dedicate a strip of land as a public highway based on the District's having "took possession of the strip of land, included it in the highway, and spent considerable money in preparing it for the public use to which it had been dedicated").[8] Even where an easement is created by permissive, continuous public use,

---

[7]       Plaintiffs rely on the preliminary injunction ruling issued in the Superior Court for the proposition that "[t]he District of Columbia recognizes the creation of easements by public dedication," Pls.' Mem. at 8 (citing Edelman Op. at 7), and to define the elements of such an easement, *id.* at 8–11. As defendant correctly points out, however, that decision is "not binding" on the evaluation of the merits of plaintiffs' case, Def.'s Opp'n at 14 (emphasis omitted) (quoting *Univ. of Tex. v. Camenish*, 451 U.S. 390, 395 (1981)), much less on an assessment of this Court's subject matter jurisdiction. Further, the Superior Court, in issuing that ruling, noted that *Brown v. Consolidated Rail Corp.*, 717 A.2d 309 (D.C. 1998), was "the only District of Columbia case that we could find that discusses the grant of an easement by public dedication." Edelman Op. at 7:14–17. That case concerned a landowner's common law duty of reasonable care to a passerby, and offered a boilerplate definition of "dedication" only in the context of assessing defendant's claim that its interest in the land in question had been transferred to the District of Columbia. *See Brown*, 717 A.2d at 315–16, 315 n.7. The *Brown* Court did not attempt to define or describe a common law easement of the sort plaintiffs seek to enforce here. In addition, as the authorities cited above indicate, District of Columbia case law extends beyond *Brown*.

[8]       Likewise, under Maryland common law, "common-law dedications are voluntary offers to dedicate land to public use, and the subsequent acceptance, in an appropriate fashion, by a public entity." *City of Annapolis v. Waterman*, 745 A.2d 1000, 1010 (Md. 2000); *see also Hackerman v. Mayor & City Council*, 130 A.2d 732, 736 (Md. 1957); *Gregg Neck Yacht Club, Inc. v. Cnty. Comm'rs*, 769 A.2d 982, 996 (Md. Ct. Spec. App. 2001) ("Once an offer by a grantor is accepted by a competent government authority, common-law dedication is complete." (internal quotations omitted)). The logic behind this rule is self-evident: public entities must accept the dedication,

D.C. courts have held that "the grant or dedication would not be binding, unless at the same time, the public use be held a complete acceptance on the part of the representatives of the public interest." *Robinson*, 14 App. D.C. at 544.

The alleged common-law easement plaintiffs seek to enforce, then, would create an interest in real property held by the District of Columbia on the public's behalf. *See Denver Area Educ. Telecomms. Consortium, Inc. v. FCC*, 518 U.S. 727, 827–28 (1996) (Thomas, J., concurring) (noting that public dedications "create enforceable public easements in the dedicated land" which are "government-owned property interest[s]"); *Wash. Land Co. v. Potomac Ridge Dev. Corp.*, 767 A.2d 891, 902 (Md. Ct. Spec. App. 2001) (finding that, for property to be dedicated to public use, the use of it "must be conferred upon and exercisable by the public *at large*"); *cf. Zere v. District of Columbia*, 209 A.3d 94, 99–101 (D.C. 2019) (concluding that continuous public use and maintenance by the District of an alleyway had established a public easement by prescription held by, and capable of enforcement by, the District on the public's behalf). Plaintiffs' contentions that property owners may establish common law easements by public dedication "without involving the District government as the designated easement holder," Pls.' Opp'n at 17, and that "the easement by public dedication . . . was a public dedication rather than a dedication to the District government," Pls.' Opp'n at 20, are simply without basis. The public "must be a party to every dedication," and is represented in such dedications by the appropriate public entity, which assumes "jurisdiction over [the dedicated] land." *Olde Severna Park Improvement Ass'n, Inc. v. Gunby*, 936 A.2d 365, 372 (Md. 2007) (first quoting *City of Annapolis v. Waterman*, 745 A.2d 1000, 1011 (Md. 2000)); *see also Bonds v. Royal Plaza Cmty. Assocs., Inc.*, 864 A.2d 257, 265 (Md. Ct. Spec. App. 2004) ("[T]he public

---

either expressly or implicitly through conduct, to "protect municipalities from having someone impose upon them the responsibility for maintenance and repair." *Waterman*, 745 A.2d at 1010 (quoting *Carr v. Hopkin*, 556 P.2d 221, 224 (Wyo. 1976)).

must be a party to every dedication."); *Pascoag Reservoir & Dam, LLC v. Rhode Island*, 217 F. Supp. 2d 206, 226 (D.R.I. 2002), *aff'd*, 337 F.3d 87 (1st Cir. 2003) ("[T]he State acquired an easement on behalf of the public, something that a sovereign, but no private individual, can do.").

Though plaintiffs argue that they are working to preserve their own interests in the character and integrity of the Adams Morgan neighborhood, *see* Pls.' Opp'n at 8–12, and although their members may suffer cognizable injuries from the demolition of the Plaza, they ultimately seek to enforce the District of Columbia's alleged property interests, held on the public's behalf, in the Plaza. While plaintiffs represent members of the public, and those members' aesthetic and recreational interests could be seriously affected by defendant's sale of the branch property, plaintiffs do not have any property interest of their own in the Plaza, do not allege that any property interest of theirs or of their members will be affected, and do not have standing to sue in defense of a property interest held, if at all, by a public entity. *See* 14 Powell on Real Property § 84.01 (2020) ("Public dedications of land are enforceable by the affected governmental authorities, and by private landowners who possess property interests that will suffer if the publicly dedicated land is obstructed."); 23 Am. Jur. 2d Dedication § 67 ("A municipality or county may maintain an action to enforce or preserve the use of a dedication of property within its borders.").[9]

---

[9] Defendant points to D.C.'s Uniform Conservation Easement Act ("UCEA"), which allows only "(1) [a]n owner of an interest in the real property burdened by the easement; (2) [a] holder of the easement; (3) [a] person having a third-party right of enforcement; or (4) [a] person authorized by other law" to bring "[a]n action affecting a conservation easement," D.C. Code. § 42-203(a), as reflecting "the District's policy with respect to such easements," Def.'s Mem. at 21; Def.'s Opp'n at 20. The UCEA provides a broad definition of "conservation easement," *see* D.C. Code § 42-201(1), which arguably encompasses the alleged easement, and applies "to any interest created before" the UCEA's effective date, "if it would have been enforceable had it been created after" the UCEA was enacted, D.C. Code § 42-204(b). Defendant does not contend, however, that the UCEA controls in this case, and the parties' positions on the UCEA's impact on the alleged easement are unclear, *see* Def.'s Mem. at 21–22; Def.'s Opp'n at 20; Pls.' Opp'n at 17–19, but this issue need not be resolved. Assuming, as the parties appear to, that the alleged easement under common law is not subject to the UCEA, the UCEA has no effect on any property interest

A case may sometimes present "countervailing considerations" that "outweigh the concerns underlying the usual reluctance to exert judicial power when the plaintiff's claim to relief rests on the legal rights of third parties." *Warth*, 422 U.S. at 500–01 (citing *United States v. Raines*, 362 U.S. 17, 22–23 (1960)); *see also Kowalski*, 543 U.S. at 129–30. To demonstrate that such circumstances exist, in addition to meeting the requirements of constitutional standing, a plaintiff must show "a close relation to the third party" and "some hindrance to the third party's ability to protect his or her own interests." *Powers v. Ohio*, 499 U.S. 400, 411 (1991) (internal citations omitted); *see also Kowalski*, 543 U.S. at 130. Parties have a "close relation" when there is "an identity of interests between the parties such that the plaintiff will act as an effective advocate of the third party's interests." *Lepelletier v. FDIC.*, 164 F.3d 37, 44 (D.C. Cir. 1999); *see also Reese Brothers, Inc. v. U.S. Postal Serv.*, 531 F. Supp. 2d 64, 67 (D.D.C. 2008).

The history of this case indicates that plaintiffs' interests run contrary to, rather than closely align with, those of the District of Columbia. As associations consisting of concerned Adams Morgan residents, plaintiffs had, and vigorously exercised, the right to demonstrate their

---

"enforceable under other law of the District of Columbia" to which the statute does not itself apply, D.C. Code § 42-204(c), and therefore does not express a "policy" relevant to enforcement of a common law easement not governed by the UCEA. Nonetheless, as the analysis set forth above shows, plaintiffs have no right to enforce the alleged easement under the common law. Even if the alleged easement would qualify as a conservation easement under the UCEA, though plaintiffs contend that "the UCEA strongly favors enforcement of conservation easements by nongovernmental entit[i]es like [p]laintiffs and by third-party beneficiaries," Pls.' Opp'n at 18, they have not shown that they are authorized by the Act to bring an action affecting a conservation easement. To the contrary, they contend that the alleged easement is held by the public at large, not KCA or AMRD, *see* Pls.' Opp'n at 20, and assert no recorded third-party right of enforcement, *see* D.C. Code § 42-202(b). Similarly unhelpful, defendant's argument that "[a]ny rights to enforce an easement on behalf of the public rests [sic] wholly within the purview of the government of the District of Columbia," Def.'s Opp'n at 19, is supported by authorities inapposite to the instant case, *see* Def.'s Opp'n at 19–20; Defs.' Mem. at 17, 19–22, either because they apply only to public easements governed by statute, not to public easements created at common law, *see* D.C. Code § 16-1331 (granting the Mayor the power to acquire, by methods including "dedication," easements "for public uses . . . in excess of that actually needed"); D.C. Att'y Gen., Opinion Letter (Nov. 11, 1976), 1976 D.C. AG LEXIS 112, at *6–7 (describing the process by which the City Council may accept dedications made pursuant to D.C. Code § 7-117), or because they simply describe the general powers of D.C. government officials, *see* D.C. Code § 1-301.81(a)(1) (granting the D.C. Attorney General "the power to intervene in legal proceedings on behalf of [the] public interest"). Defendant's reliance on *Long Green Valley Ass'n v. Bellevale Farms, Inc.*, 68 A.3d 843 (Md. 2013), a case concerning a dispute about who had the right to enforce a written easement between a property owner and a Maryland agency under the express terms of the agreement creating it, *see id.* at 859, is likewise misplaced.

opposition to the demolition of the Plaza and to attempt to persuade the District to adopt their position.  Plaintiffs circulated petitions, worked with elected officials, and testified before the District's Historic Preservation Review Board, the government entity charged, under D.C. law, with assessing whether defendant's proposal for the branch property accorded with the character of the neighborhood and approving (or denying) its application for redevelopment of a property in a historic district.  D.C. Code §§ 6-1104 to 6-1108; *see supra* Part II.A, pp. 6–7.  Yet, ultimately, the Historic Preservation Review Board approved the redevelopment project, *see* Historic Preservation Review Board Minutes at 2, and the District has declined to intervene in this litigation to enforce an easement that allegedly runs in favor of its citizens.  The District thus appears to have determined that it does not share plaintiffs' interest in preserving the Plaza.  Nor is there any apparent hindrance to the District's asserting its own alleged right against defendant.[10]

That plaintiffs likely have constitutional standing, *see supra* n.5, does not alter this analysis.  "[A] party's interest for the purposes of constitutional standing does not automatically confer prudential standing" because "[p]rudential standing imposes different demands than injury in fact."  *Wilderness Soc'y v. Kane County*, 632 F.3d 1162, 1171 (10th Cir. 2011) (en banc) (first citing *City of Los Angeles v. County of Kern*, 581 F.3d 841, 848 (9th Cir. 2009); and then citing *MainStreet Org. of Realtors v. Calumet City*, 505 F.3d 742, 745 (7th Cir. 2007)).  A party may therefore suffer a cognizable injury for Article III purposes but still lack a right to relief.  Plaintiffs fall in this category.  Without any circumstances in favor of allowing plaintiffs

---

[10]    *Chevy Chase Citizens Ass'n v. D.C. Council*, 327 A.2d 310 (D.C. 1974), which plaintiffs cite in defense of their ability to seek injunctive relief, Pls.' Opp'n at 24–25, is not to the contrary.  The plaintiffs in that case sought relief from a decision of the District of Columbia Council to close a street and convey title to the abutting landowners.  *Chevy Chase Citizens Ass'n*, 327 A.2d at 311.  The court, in determining that it lacked jurisdiction under the District's Administrative Procedure Act, "note[d]" that the plaintiffs could bring "[a]n action seeking equitable relief . . . in the Superior Court."  *Id.* at 317 n.18.  Unlike plaintiffs here, however, the *Chevy Chase* plaintiffs did not attempt to directly assert property rights held by a third party.

to assert the District's property interests, plaintiffs lack prudential standing to enforce an alleged public easement by dedication that, if created, would run in favor of the District of Columbia on the public's behalf.

In this Circuit, prudential standing remains "a threshold, jurisdictional concept" that goes to a federal court's subject matter jurisdiction.  *Deutsche Bank Nat'l Tr. Co.*, 717 F.3d at 194 n.4. Thus, in the absence of prudential standing, the Court lacks subject matter jurisdiction over this case, which was removed by defendants from the Superior Court of the District of Columbia.  "If at any time before final judgment it appears that the district court lacks subject matter jurisdiction" over a case removed from state court, "the case shall be remanded."  28 U.S.C. § 1447(c); *see also Republic of Venezuela v. Philip Morris Inc.*, 287 F.3d 192, 196 (D.C. Cir. 2002) ("When it appears that a district court lacks subject matter jurisdiction over a case that has been removed from a state court, the district court must remand the case[.]").[11]  Accordingly, the instant case must be remanded to the Superior Court of the District of Columbia.

## IV.    CONCLUSION

Plaintiffs seek to enforce an alleged easement by public dedication that, if proven, would be held by the District of Columbia on behalf of the public.  As a result, although plaintiffs likely have constitutional standing stemming from the harms the proposed development of the branch property would impose on their members, they lack prudential standing because their claim rests

---

[11]        Absent the particular procedural posture of this case as being removed to this Court, dismissal for lack of plaintiffs' standing would be warranted.  As another Judge on this Court has noted, "at least one court of appeals has suggested that a district court may dismiss a case when a remand would be futile," *Brookens v. Am. Fed'n of Gov't Emps.*, 315 F. Supp. 3d 561, 570 (D.D.C. 2018) (Moss, J.) ("[D]ismissal, rather than remand, may be proper if . . . the state court in which [the case] was brought also would lack jurisdiction.") (first alteration and omission in original) (quoting *Boaz Legacy, L.P. v. Roberts*, 628 F. App'x 318 (5th Cir. 2016) (mem.))), and such "a futility exception comports with principles of judicial economy and common sense," *id*. at 571.  At the same time, however, "[m]ost other courts of appeals . . . have concluded that the clear language of the statute is dispositive," *id*. at 570, and "the D.C. Circuit has not addressed whether § 1447(c) is subject to a futility exception," *id*.  Like the D.C. Circuit, "[t]he Supreme Court . . . has stressed the mandatory nature of § 1447(c), even though it ultimately did not decide whether the statute admits of a futility exception."  *Id*. (citing *Int'l Primate Prot. League v. Adm'rs of Tulane Educ. Fund*, 500 U.S. 72, 89 (1991)).

on the legal rights of a third party, namely, the District of Columbia.  This Court therefore does not have subject matter jurisdiction over the case, which as a result must be remanded to the Superior Court of the District of Columbia.

An Order consistent with this Memorandum Opinion will be entered contemporaneously.


Date: September 23, 2020

_____
BERYL A. HOWELL
Chief Judge